16343

## RICE HOPE PLANTATION v. SOUTH CAROLINA PUBLIC SERVICE AUTHORITY

(59 S. E. (2d) 132)

504

*Messrs. R. M. Jefferies,* of Walterboro, and *W. D. Simpson,* of Moncks Corner, and *James B. Morrison,* of Georgetown, *for Appellant,*

*Messrs. Buist & Buist,* of Charleston, and *Herbert L. Smith,* of Georgetown, *for Respondent,*

*Messrs. R. M. Jefferies,* of Walterboro, and *W. D. Simpson,* of Moncks Corner, and *James B. Morrison,* of Georgetown, *for Appellant,*

April 18, 1950.

L. D. LIDE, Acting Associate Judge.

This case comes before us upon the pleadings only. The defendant moved to strike out certain allegations of the complaint upon the ground that they are irrelevant, immaterial and redundant; and reserving, not waiving, its rights under the motion to strike, answered the complaint. Whereupon the plaintiff moved to strike out certain paragraphs of the answer upon the ground that they are irrelevant and immaterial; and also moved to require the defendant to make certain allegations of its answer more definite and certain. These motions came on to be heard before Judge Moss, who was then presiding in the Twelfth Circuit; and thereafter he handed down his order, dated April 20, 1949, wherein he overruled defendant's motion relating to the complaint, except in a minor particular, and wherein he granted plaintiff's motions to strike out certain paragraphs of the answer and to make more definite and certain some particular alle-

gations thereof. From this order the defendant appeals to this Court.

While nothing was said on this point in the oral argument at the bar of this Court by counsel on either side, it appears in the brief of the respondent that while it is admitted that so much of the order of the Circuit Court as strikes out certain parts of the answer is subject to this interlocutory appeal, it is argued that otherwise the appeal is premature. Hence we must first determine the scope of the appeal. It is provided in Section 26, Code 1942, that the Supreme Court shall have appellate jurisdiction with regard to any intermediate judgment, order or decree in a law case involving the merits, in actions commenced in the Court of Common Pleas; and there is a further provision that the Supreme Court may upon appeal from a final judgment review any intermediate order or decree necessarily affecting the judgment and not before appealed from.

This Court in considering this section has generally and correctly held that orders refusing to strike out allegations in a pleading are not subject to interlocutory appeal, and that orders granting motions to make more definite and certain are not so appealable, unless the merits are involved. But the rationale of these decisions should be considered, and that is well stated in the case of *Woods v. Rock Hill Fertilizer Co.,* 102 S. C. 442, 86 S. E. 817, 819, Ann. Cas. 1917-D, 1149, wherein it is said in the opinion delivered by Mr. Justice Hydrick: "Appellee objects to the consideration of the appeal from the refusal of the court to strike out certain allegations of the complaint and to grant the motions for nonsuit and direction of the verdict, on the ground that the rulings and orders as to those matters are not appealable, until after final judgment. Ordinarily, that is so, and the objection would be well taken, if the appeal were based solely upon such matters. The reason of the rule is to prevent unnecessary delay in the trial of causes by appeals from interlocutory orders which may have no prejudicial effect upon the final judgment. But, as the order overruling the demurrer

is appealable, the reason for the rule does not apply, and it will be better for both parties in the further progress of the case to have these questions decided."

It will thus be seen that the Court in the cited case considered all matters involved in the appeal, because one of the orders before it was appealable; but also upon the ground that so to do was in furtherance of the interests of both parties. And a like conclusion has been reached by this Court in other cases. In the case of *Miles v. Charleston Light & Water Co.*, 87 S. C. 254, 69 S. E. 292, 293, the Court had before it an appeal from an order relating to a demurrer, and also from an order denying a motion to require the plaintiff to make the complaint more definite, and it was held that the latter order was not appealable, but that the order upon the demurrer was, and hence the Court said, "it is not deemed objectionable to consider the motion to make definite along with it." And in the case of *Waldrop v. M. & J. Finance Corp.*, 176 S. C. 490, 180 S. E. 555, an order refusing a motion to strike and overruling a demurrer was considered and reversed on appeal. See also *Lentz v. Carolina Scenic Coach Lines*, 208 S. C. 278, 38 S. E. (2d) 11.

It is manifest, in the case at bar, that the merits of the cause are involved in the order before the Court, and that it is indeed essential that all phases of the order be passed upon to avoid confusion in the trial of the cause in the Circuit Court, and that this will be better for both parties in the further progress of the case. We have here a single order from a part of which an appeal admittedly will lie, but it is manifest that the entire order should be considered upon this appeal; and the cases cited are sufficient to support this conclusion. Besides, the defendant's motion to strike out certain allegations in the complaint is clearly somewhat in the nature of a demurrer, for the complaint attempts to set up at least four separate causes of action mingled together, and the motion to strike seeks to eliminate allegations with reference to three of the causes of action attempted to be alleged. It is true that it would have been

more technically correct for the defendant first to require the causes of action to be alleged separately, and then to interpose a demurrer in due form. But we do not think this is sufficient, under the circumstances of this case, to affect the duty of this Court to consider the appeal as it relates to the entire order of the Circuit Court.

This action was commenced in the Court of Common Pleas for Georgetown County on September 24, 1948, and the complaint alleges that the plaintiff, Rice Hope Plantation, which is a corporation, is the owner of a certain large tract of land on the lower Santee River, lying in part on the north or mainland shore of the North Santee River, and in part on the south or delta shore of the North Santee River; the delta being a large island, and a part of the plaintiff's property extends through the width of the delta to the South Santee River. And the complaint further alleges that the defendant constructed a dam on the Santee River above the plaintiff's property, which diverted into the Cooper River a large part of the normal flow of the fresh water Santee River, and that this in turn caused salt water from the ocean to invade the Santee River to and above the plaintiff's property, and to infiltrate into the streams, creeks, canals, ponds and drainways that run through this property; and the salting of these waters, both in the river itself and in its minor tributaries, is alleged to have damaged plaintiff's property and decreased its value.

And there are other allegations to the effect that since the construction of the defendant's dam the water in the creeks and watercourses occasionally overflows the normal high water mark of the streams by reason of release by the defendant of water through its dam in times of freshets or by reason of storm tides or other similar causes; and that the water that overflows the normal high water mark is strongly saline, and, while temporarily on the land, it kills and destroys vegetation, whenever such overflow immerses the same or causes the introduction of salt into the soil. The

prayer of the complaint is for judgment in the sum of $85,-000.00.

Counsel for the plaintiff, the respondent, herein, assert, and indeed the matter is referred to by Judge Moss in his order, that the plaintiff has woven into the complaint "five theories of law, on any of which recovery can be had under the facts stated". In other words, the plaintiff appears to claim that it has more than one cause of action, and presumably that these causes of action might be joined in the same complaint.

As we read the complaint, we think it is clear that it does properly allege a cause of action for the recovery by the plaintiff from the defendant, a governmental corporate agency, just compensation for the property of the plaintiff alleged to have been *taken,* pursuant to the provisions of the State Constitution in Article I, Section 17. See *Chick Springs Water Co. v. State Highway Dept.,* 159 S. C. 481, 157 S. E. 842, and the many cases following it. But we are of the opinion that this is the only cause of action which is legally stated in the complaint, although there are allegations therein attempting to set up three other causes of action, to wit, a cause of action in tort, a cause of action under the Federal Power Act, 16 U. S. C. A. § 791a *et seq.,* and a cause of action in *quasi*-contract. The defendant's motion seeks to strike out the allegations relating specifically to these three claimed causes of action, and, as we have hereinbefore indicated, the motion may be considered as somewhat in the nature of a demurrer.

### Defendant's Motion To Strike.

Briefly stated, the allegations sought to be stricken out of the complaint are as follows: (1) allegations of negligence and recklessness in paragraph 14; allegations of negligence in paragraph 22 (together with an allegation stricken out by Judge Moss); allegations in paragraph 27 charging the defendant with discrimination against the plaintiff in favor of other landowners on other rivers, by the construction of

protecting engineering works, and by the payment to some of them of large sums of money in consideration of the damage done to them by water; (2) paragraph 31 alleging that this action is brought for damage suffered by the plaintiff up to the date of the summons herein only; (3) allegations in paragraph 16 relating to the Federal Power Act, to the effect that the defendant under and by virtue thereof has become pecuniarily liable for all damage occasioned to the property of others by the construction, maintenance or operation of its engineering works; (4) allegations in paragraph 18 to the effect that by reason of the acts of the defendant, it has been unjustly enriched at the expense of the plaintiff; and (5) allegations in paragraphs 24 and 25 relating to the rights of hunting, fowling and fishing on the plaintiff's land.

### No. (1) Allegations Relating to Tort

Certainly the allegations complained of, and mentioned in No. (1), directly attempt to state a cause of action against the defendant in tort; and it is of course quite obvious that these allegations are irrelevant, and should be stricken out, if the defendant as a governmental agency, or as an integral part of the State, is immune from an action *ex delicto*. Hence we must first consider the nature and status of the defendant.

The South Carolina Public Service Authority was created in and by an act of the General Assembly of 1934, incorporated in the 1942 Code as Sections 8555-11 to 8555-24, both inclusive, (and there is a subsequent amendment immaterial here); and it is therein stipulated that the Authority shall have power "to develop the Cooper River, the Santee River, and Congaree River in this State, as instrumentalities of intrastate, interstate and foreign commerce and navigation; to produce, distribute and sell electric power; to reclaim and drain swampy and flooded lands; and to reforest the water sheds of rivers in this State;" together with all powers necessary or convenient in the exercise of the powers stated; and it is further recited that the Authority shall have other powers including: "To sue and be sued."

Without entering into any unnecessary detail, it may be noted that the act creating the Public Service Authority especially confers the power of eminent domain, and also contains the following significant section, to wit, Section 8555-19: "The South Carolina public service authority is a corporation completely owned by and to be operated for the benefit of the people of South Carolina, and any and all net earnings thereof not necessary or desirable for the prudent conduct and operation of its business or to pay the principal of and interest on its bonds, notes or other evidences of indebtedness or other obligations or to fullfill the terms and provisions of any agreements made with the purchasers or holders thereof or others shall be paid over semi-annually to the state treasurer for the general funds of the State and shall be used to reduce the tax burdens on the people of this State."

In order that some other pertinent terms of the act may be before the Court, in considering the points raised by counsel, the following section thereof is also quoted, to wit, Section 8555-21: "Nothing contained in the provisions of §§ 8555-11 through 8555-24 shall, at any time or in any manner, involve the credit and taxing power of the State of South Carolina, or of any of its political subdivisions; nor shall any of the securities or other evidences of indebtedness authorized to be issued in and by §§ 8555-11 through 8555-24 ever be or constitute obligations of the State of South Carolina or of any of its political subdivisions; nor shall the State of South Carolina or any of its political subdivisions ever be liable or responsible, in any way, for the payment of the principal or interest of or on such security or other evidences of indebtedness."

The status of the South Carolina Public Service Authority has heretofore been considered and determined by this Court, and we think the following statement from the unanimous opinion in the case of *Creech v. South Carolina Public Service Authority*, 200 S. C. 127, 20 S. E. (2d) 645, 648, succinctly and correctly describes

it: "In our opinion, the South Carolina Public Service Authority is a public corporation in the nature of a *quasi* municipal corporation, exercising certain governmental functions as an agency of the State." See also *Clarke v. South Carolina Public Service Authority,* 177 S. C. 427, 181 S. E. 481. Manifestly, a *quasi*-municipal corporation, as an agency of the State, is also in a real sense a part of the State, and shares in its sovereignty; and the South Carolina Public Service Authority was created "for the convenient accomplishment of what must be regarded as an important governmental function." *Dillon Catfish Drainage District v. Bank of Dillon,* 143 S. C. 178, 141 S. E. 274, 276.

The case of *Brooks v. One Motor Bus,* 190 S. C. 379, 3 S. E. (2d) 42, 43, covers an important phase of the matter before us so fully that no further citation of authority really seems to be necessary. We quote the following from the opinion: "In this State neither the commonwealth nor any of its political subdivisions is liable in an action *ex delicto* unless made liable by express enactments of the General Assembly, except where the acts complained of, in effect, constitute a taking of private property for public use without just compensation." It was further held in this case that immunities attaching to sovereignty "are never to be considered as waived or surrendered by any inference or implication", and statutes permitting suits "for damages to property and persons, being in derogation of sovereignty, should be construed strictly."

In the case of *Sherbert v. School District No. 85, Spartanburg County,* 169 S. C. 191, 168 S. E. 391, 393, the Court held that a statute providing that a school district "may sue and be sued" cannot be construed "to make a school district liable in an action *ex delicto,* as it is not so expressly provided by its terms."

It follows from what we have said that the power conferred upon the South Carolina Public Service Authority "to sue and be sued" cannot reasonably be construed to authorize an action *ex delicto.*

Counsel for the respondent, however, urge that since the credit of the State is not granted to the Authority, the effect is to give it such separate corporate existence as to make it liable in an action for tort. But we do not think this conclusion is warranted. This provision of the statute does no more than to provide that the project shall be financed as self-liquidating; a method of financing which in recent years has become fairly common, under which bonds are executed known as revenue bonds. See *Clarke v. South Carolina Public Service Authority*, 177 S. C. 427, 181 S. E. 481, *supra*. The governmental character of the functions of the Authority cannot be deemed impaired by this financial provision, nor can it be made liable in tort by any such far reaching or remote implication.

A very significant case in this connection is the recent case of *South Carolina Electric & Gas Co. v. South Carolina Public Service Authority*, decided August 1, 1949, 215 S. C. 193, 54 S. E. (2d) 777, 786, wherein this Court held that the South Carolina Public Service Authority "is, in effect, a State agency just as the Public Service Commission is and both are subject to constitutional legislation which may be enacted by the General Assembly of the State." Surely this is sufficient to show that the Authority is completely identified with the State in the performance of its public functions, which are unquestionably of a governmental character.

Counsel for the respondent cite the well known case of *Hopkins v. Clemson Agricultural College*, 221 U. S. 636, 31 S. Ct. 654, 55 L. Ed. 890, 35 L. R. A., N. S., 243, as an authority in contravention of the views above expressed. In that case the plaintiff sued for damages to his farm due to the College having built a dyke which caused the waters of the Seneca River to overflow his land. The Court of Common Pleas dismissed the complaint, upon the ground that the State was a necessary party and had not consented to be sued, and this Court affirmed the judgment of the Circuit Court. 77 S. C. 12, 57 S. E. 551. The Supreme Court of the

United States reversed the decision of this Court, holding that the plaintiff was constitutionally entitled to compensation for the taking of his property by the defendant for a public use. This declaration of the law was cited and strongly relied upon in the majority opinion delivered by Mr. Justice Cothran in the *Chick Springs case* above mentioned, a *cause celebre,* establishing a proper remedy whereby an action at law will lie to recover just compensation for private property *taken* for public use, pursuant to the provisions of Section 17, Article I, of our Constitution. Hence the *Hopkins case* and the case before us are actually not in conflict.

But incidentally it may be mentioned that the status of the South Carolina Public Service Authority is quite different from that of Clemson College; which, although most highly useful and valuable to the State, is not an institution or corporation wholly owned and controlled by the State, especially in view of the will of Thomas G. Clemson, its founder, pursuant to which seven of the board of thirteen trustees were to consist of members nominated by the testator, with the continuing right to fill vacancies in their own number; the remaining six trustees to be elected by the Legislature of South Carolina in joint assembly; and of course this method of choice of the trustees prevails under the law. Section 5732, Code 1942.

It follows therefore that the allegations of negligence appropriate in a tort action should be stricken out, especially because they are not proper in an action for the recovery of just compensation for property "taken". *Sheriff v. City of Easley,* 178 S. C. 504, 183 S. E. 311; and *Baynham v. State Highway Department,* 181 S. C. 435, 187 S. E. 528. It is proper, however, to add this word of explanation to what has just been said: It is quite true that one's property might sometimes be taken, within the constitutional meaning, as a result of *negligence.* Indeed, this is precisely what happened in the *Chick Springs case.* But the reason for the rule, eliminating the allegation of negligence, is well explained in the opinion delivered by Mr. Justice Baker (now

Chief Justice) in the case of *Sheriff v. City of Easley,* 178 S. C. 504, 183 S. E. 311, 316, *supra,* from which we quote the following: "We hold that in an action against a municipal corporation under article 1, § 17, of the Constitution, for the taking of private property for public use without compensation, it is not necessary to allege or offer proof that such municipal corporation has negligently established, maintained, or operated that which has caused damages amounting to a taking, and that if there has been a taking without compensation, and a denial of the right of compensation, it is immaterial if the taking was due to the negligence of such municipal corporation; otherwise there could easily be cases of a taking without compensation, and the one whose property has been taken would be without remedy or redress if such municipal corporation was not guilty of negligence and denied the right of compensation."

The allegations of *recklessness,* which might be appropriate in an action for tort, where punitive damages are sought, certainly have no place here and should be stricken out. The plaintiff does not ask for punitive damages in its complaint, and yet the charge of recklessness is made, which would indeed be proper in an action for tort, especially where punitive damages are sought, but has no place in an action for just compensation.

The plaintiff also includes allegations charging the defendant with discrimination against the plaintiff, upon the ground that it has heretofore paid large sums of money to other landowners by way of damages to their property due to the invasion of water, or has constructed protective engineering works, and these allegations might possibly be appropriate in an action for tort, under the authority of the case of *Gadsden v. Catawba Water Power Co.,* 71 S. C. 340, 51 S. E. 121, which was an action in tort by an employee against his employer, and in which there were abundant allegations upon which punitive damages might be allowed. But obviously such allegations have no place in the suit at bar. "Just compensation" does not include punitive or exemplary damages.

### No. (2) Allegations Relating to Future Damages

Paragraph 31 of the complain alleges that this action is brought for damages suffered by the plaintiff up to the date of the summons herein, and is not intended to include any future damages to plaintiff's land which might be done hereafter by the defendant. We think this paragraph should be stricken out as irrelevant under any theory of the complaint. If the injury complained of is of a permanent character, then it follows that the plaintiff has a single cause of action which cannot be split. Furthermore, the well settled rule is that in an eminent domain proceeding all loss occurring by the "taking" should be assessed in one proceeding. See 18 Am. Jur. 887, and the annotation in 75 A. L. R. 855, wherein is cited, among others, the South Carolina case of *Wateree Power Co. v. Rion,* 113 S. C. 303, 102 S. E. 331, in which it was held that the amount of compensation in a condemnation case should take into account future use of the property involved. This would seem to be applicable to the instant case, as the converse of an eminent domain proceeding.

On the other hand, however, if for any reason a new cause of action should hereafter arise in favor of the plaintiff against the defendant, it would not be necessary or proper to make any allusion in the complaint herein to any such anticipated or speculative cause of action with which the Court could not now be concerned.

### No. (3) Allegations Relating to the Federal Power Act

The complaint alleges in paragraph 16 thereof that the Authority obtained a license from the Federal Power Commission, under which it has operated, and that it has therefore subjected itself to all the requirements of the Federal Power Act, and that by virtue thereof the Authority has become pecuniarily liable for all damages occasioned to the property of others by the construction, maintenance or operation of its engineering works; and so much of these alle-

gations as purport to impose liability upon the defendant are sought to be stricken out in the motion before us.

It appears that the act of the General Assembly embodied in Code Section 8555-27 confirms and ratifies the acquisition of the license issued by the Federal Power Commission, and the South Carolina Public Service Authority was thereby fully and completely authorized and empowered to construct "the Santee-Cooper Hydro-Electric and Navigation Project". And it also appears that the Federal Power Act, 16 U. S. C. A. § 803 (c), provides that a licensee "shall be liable for all damages occasioned to the property of others by the construction, maintenance, or operation of the project works or of the works appurtenant or accessory thereto, constructed under the license, and in no event shall the United States be liable therefor."

Counsel for the respondent state in their brief that ██ ██ of the several legal rights asserted by it in its complaint, the primary right upon which it relies, as the main basis of its cause of action, is the Federal Power Act from which the above quotation is taken. We do not think, however, that the quoted language from the Federal Power Act can be construed to devolve upon the licensee a *newly created liability,* but that it merely means to say that if there is legal liability arising because of damages to the property of others, in the construction, maintenance or operation of the project works, it shall be the liability of the licensee, and not that of the Federal Government as the licensor; but this was not left to implication, for the Federal Power Act, 16 U. S. C. A., § 821, specifically provides as follows: "Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein."

The principal authorities relating to this phase of the case are the two cases cited by counsel on each side, to wit, *Henry*

*Ford & Son v. Little Falls Fibre Co.*, 280 U. S. 369, 50 S. Ct. 140, 74 L. Ed. 483, and *Pike Rapids Power Co. v. Minneapolis, St. P & S. S. M. Railroad Co.*, 8 Cir., 99 F. (2d) 902, 912. We think it is clear that these decisions properly construed sustain the views that we have expressed.

In the first case mentioned, to wit, the *Ford case,* the Supreme Court of the United States held that such a license could not be used as a shield to protect the licensee from liability under the State law; and furthermore that the acts complained of constituted, "under local law", an actionable wrong entitling the injured parties to relief; and it was expressly recognized that this liability was one created by the State law.

In the other case mentioned, the *Pike Rapids case,* the Court held that the wording of the Federal Power Act as to liability for damages meant "lawful damages". And the Court rejected the contention that the Federal Power Act created any new cause of action, and held "that the rights and liabilities of the parties are to be determined by the laws of Minnesota." It should be observed that in this case the Supreme Court of the United States denied the petition for a writ of certiorari, 306 U. S. 640, 59 S. Ct. 488, 83 L. Ed. 1040.

It was likewise held in the Alabama case of *Alabama Power Co. v. Smith,* 229 Ala. 105, 155 So. 601, that the licensee's assumption of liability refers only to a liability "otherwise existing". We are therefore of opinion that the particular allegations in the complaint now under consideration should have been stricken out.

No. (4) Allegations Relating to *Quasi-*Contract

It is alleged in paragraph 18 of the complaint that by the reason of the acts of the defendant it "has been unjustly enriched at the expense of the plaintiff"; and it is further alleged that the unjust enrichment arises because the defendant has invaded with salt water and taken the use of plaintiff's land for the purpose of defendant's power de-

velopment, without the consent of the plaintiff, and without making any payment for such use. The allegations of unjust enrichment seem to have been made as the basis of an action in *quasi*-contract. But no such cause of action is really stated, for the reason, *inter alia,* that there is no factual basis for the allegation of "unjust enrichment", because the facts stated in the complaint, if established by the evidence, merely show that the defendant in the exercise of its legal duties and powers has taken the property of the plaintiff for a public use, for which just compensation should be made. The exclusive remedy provided by law for the taking by a governmental agency of one's property for a public use, in the absence of a statute to the contrary, is the right to recover just compensation for the same, and that cause of action is set up in the complaint before us.

It should further be said that the plaintiff here could not have an action in *quasi*-contract, unless it also had an action in tort; for if there was any *unjust enrichment,* it would be the result of a tort, which in a proper case might be waived and the action treated as one in *quasi*-contract. See annotation in 97 A. L. R. 250. But, as we have already shown, the defendant is immune from an action in tort, and would therefore be immune from an action in *quasi*-contract based upon tort.

## No. (5) Allegations Relating to Hunting and Fishing Rights

This brings us down to the allegations of the complaint, in paragraphs 24 and 25 thereof, charging that the alleged action of the defendant in increasing the salinity of the waters on plaintiff's property has decreased the value thereof, because the plaintiff's hunting and fishing rights have thus been damaged or destroyed; although the plaintiff expressly admits that the actions of the defendant did not result in the death of game or fish on the property or in the waters owned by the plaintiff; but it is alleged that the actions of the defendant have rendered the property and waters owned by

the plaintiff unsuited and inhospitable to game and fish, and that this changed condition of the property results in damages to the same.

Every landowner has, as an incident to the ownership thereof, the right to hunt and fish thereon, subject to reasonable governmental regulations, although game and fish are really the property of the State, and the preservation thereof is a matter of public interest. However, it remains true that the right to hunt and fish on one's own premises is a right of property incident thereto which may even be granted or leased to others. 24 Am. Jur. 377-379.

Upon due reflection we have therefore concluded that it cannot be said, as a matter of law, that the impairment of the right of hunting, fowling and fishing upon the plaintiff's land, if indeed there was such impairment, is not an element which might affect the matter of just compensation for the alleged taking of property by the defendant. Hence these particular allegations were properly allowed to remain in the complaint.

The result of our holding with regard to defendant's motion to strike from the complaint therefore is that all the allegations complained of should have been stricken out, save and except only the allegations contained in paragraphs 24 and 25 relating to the rights of hunting, fowling and fishing, and that these two paragraphs should remain as they are without the elimination of any part thereof.

### Plaintiff's Motion To Strike

The defendant's answer purports to set up three separate defenses. The first defense admits that the defendant constructed a dam across the Santee River for the purpose of diverting a part of the flow thereof into the Cooper River; and alleges that it has acted as an agency and part of the State primarily for the improvement of navigation on the Congaree, Wateree, Santee and Cooper Rivers, and for other public purposes, for the benefit of the State and its people; but it denies that it has injured or damaged the plaintiff in

any manner whatsoever or that it has taken any of its property. The third defense sets up the defendant's immunity from suit.

The plaintiff's motion relates only to the second defense, from which it seeks to strike out certain paragraphs thereof, to wit, 2, 4 and 6. This defense is described by counsel for the appellant as the "navigation defense"; that is to say, that since the primary duty which rested upon the defendant was the improvement of navigation, all property adjoining tidal navigable streams is impressed with an easement or servitude of navigation in favor of the State, its people and its agencies.

The allegations of these three paragraphs (with one exception) may be somewhat briefly stated as being to the effect that prior to the creation of the Authority by the General Assembly, the condition of the Santee River and its tributaries was such as to hamper and prevent the development thereof in the aid of commerce, industry, agriculture or in any other way for the benefit of the State and its people; and that the Authority in the performance of its duty and obligation constructed, and now maintains and operates, its project, consisting substantially of a dam across the Santee River and other works incident thereto; and that as a result thereof, among other things, the water distance from the coast to Columbia has been decreased by more than 100 miles, health conditions have been improved, and other public purposes for which the Authority was created have been subserved. And it is alleged in paragraph 6 that the Authority was charged with the duty to divert waters from the Santee River and to discharge the same into the Cooper River, and that all past and future development thereof has been, and will be, conducted in pursuance of its primary purpose of navigation, and in accordance with the obligations and duties with which the Authority is charged.

It thus appears that the allegations of these paragraphs are relevant to the alleged navigation defense; in other words, the Authority should have the right

to allege and prove the performance of its duties under the law with respect to navigation, including the alleged improvement thereof and the resulting public benefits. As to how far such evidence should go in detail will be a matter for the trial Judge. *Charles v. Texas Co.,* 192 S. C. 82, 5 S. E. (2d) 464. We conclude therefore that Judge Moss in the proper exercise of his discretion should have denied the motion of the plaintiff, save and except as to the last sentence in paragraph 4 which reads as follows: "The property described in the Complaint has been benefitted by said navigation works in that said works have provided a greatly improved water route with decreased sailing time from said property to Columbia and the interior of the State, in place of the narrow and tortuous channel previously existing."

The quoted language from paragraph 4 we think was properly stricken out, because it does not constitute any defense to the complaint, as it stands after eliminating therefrom all causes of action or purported causes of action, save and except the cause of action to recover just compensation for the alleged taking of plaintiff's property for a public purpose. As we have hereinbefore stated, the power of eminent domain was conferred upon the South Carolina Public Service Authority; and this was done in and by Code Section 8555-15, which provides that condemnation proceedings by the Authority "shall be instituted and prosecuted in the manner provided for and authorized in article 9 of chapter 160, providing for securing to railroads a right-of-way in this State." Article 9 to which reference is thus made is included in Sections 8437-8450, both inclusive; and it is provided in Section 8440 that the value of the property is to be determined "irrespective of any benefit which the owner may derive" from the proposed construction. It follows therefore that even special benefits would not be available as an offset or defense to an action constituting the converse of a condemnation proceeding.

As we have already stated, our conclusion is that the three paragraphs, with the single exception of the last sentence in

paragraph 4, should have been allowed to remain in the answer, in the proper exercise of the discretion of the Circuit Judge. But attention should also be directed to the fact that, as we read his order, in this particular his conclusion was manifestly influenced by what we deem to be an error of law. For he states that the fallacy of the defendant's position is that it is not the United States, and has none of the powers, rights, privileges and duties of that sovereignty, other than such limited powers and privileges as were granted to it by the license under the Federal Power Act; and that the defendant is not the State of South Carolina.

We are of opinion, however, that the defendant ██ ██ is, for the purposes under consideration, the State of South Carolina, and that as such it has, in this connection, the powers, rights, privileges and duties of the State Government. While it is quite true that the rights and powers of the Federal Government with reference to navigation are paramount to those of the State, the latter remain in full force and effect, unless and until Congress acts upon the subject. *Escanaba & Lake Michigan Transportation Co. v. City of Chicago,* 107 U. S. 678, 2 S. Ct. 185, 27 L. Ed. 442. And we hold that the liability of the South Carolina Public Service Authority to a riparian owner for damages, if any, alleged to have been sustained by reason of the diversion of waters from the Santee River to the Cooper River, is substantially the same as that which would be applicable, if the United States were involved.

Perhaps the most important recent case on this subject is that of *United States v. Commodore Park,* decided in 1945, 324 U. S. 386, 65 S. Ct. 803, 805, 89 L. Ed. 1017, wherein the opinion of the Court was delivered by Mr. Justice Black. In that case the United States dredged a tide water navigable bay and deposited the dredged materials in a navigable arm of the bay called Mason Creek, thereby destroying its navigability, and impairing certain benefits alleged to be inherent in the proximity of the land to a navigable tide water creek.

The Court held, however, that a riparian owner is not entitled to compensation for the deprivation of his access to navigable waters. In other words, it was held in this case that the riparian owner was not entitled to recover, because the damages complained of did not result from "taking" by the government of its property for public use, since there had been no invasion of its "fast lands" (lands above high water mark), for its property was more than a mile from the fill made in Mason Creek. The following quotation from the opinion is quite illuminating: "Respondent's property was always subject to a dominant servitude; it did not have a vested right to have this navigable stream remain fixed and unaltered simply because of the consequent reflected additional market value to adjacent lands. Whatever market value of riparian lands may be attributable to their closeness to navigable waters, does not detract from the government's 'absolute' power in the interests of commerce, to make necessary changes in a stream. In short, as against the demands of commerce, an owner of land adjacent to navigable waters, *whose fast lands are left uninvaded*, has no private riparian rights of access to the waters to do such things as 'fishing and boating and the like', for which rights the government must pay." Emphasis added.

The Court also adverted to the fact that the State of Virginia, in which the premises were situated, recognized the landowners' title to land between high and low water marks of a tidal creek, but held that this fact did not give to the landowner any right to compensation. We quote the following additional excerpt from the Court's opinion: "*United States v. Chicago, M., St. P. & P. R. Co.,* 312 U. S. 592, 596-598, [313 U. S. 543], 61 S. Ct. 772, 775, 776, 85 L. Ed. 1064, 1069-1071, set at rest any remaining doubt concerning the dominant power of the government to control and regulate navigable waters in the interest of commerce, without payment of compensation to one who under state law may hold 'technical' legal title (as between himself and

others than the government) to a part of the navigable stream's bed."

Counsel for the plaintiff in their elaborate brief argue at length that the State of South Carolina has no such easement or servitude as the United States has over land in the bed of a navigable stream. But we find nothing in our Constitution, statutes or decisions confirming this view. Lands lying between high and low water marks of a navigable stream are under the express decision of this Court held by the State in trust for public purposes, and obviously a public purpose with reference to such lands is that relating to navigation. *Cape Romain Land & Improvement Co. v. Georgia-Carolina Canning Co.,* 148 S. C. 428, 146 S. E. 434.

The general law with reference to the power of the State in connection with this matter is well stated in the following quotation from 18 Am. Jur. 800: "The waters of the ocean and its bays, and of public watercourses and lakes, so far as they lie within the jurisdiction of a state, are part of the public domain, and the state may authorize the diversion of such waters for any purpose it deems advantageous to the public, without providing compensation to riparian proprietors injuriously affected. Such diversion is not a taking of private property by eminent domain, but a disposition by the public of the public property."

Our own case of *McDaniel v. Greenville-Carolina Power Co.,* 95 S. C. 268, 78 S. E. 980, 981, 6 A. L. R. 1321, we think, conforms to the quoted excerpt. In that case the defendant, a private corporation, was given the right to build a dam across a navigable stream, and this action was brought by a riparian landowner for damages arising out of the construction and maintenance of the dam, and the Court held that the plaintiff was entitled to relief under Article I, Section 17, of the Constitution, not because of the diversion of the waters from one channel to another, but because of an invasion of plaintiff's land above normal high water mark.

For the cause of action is stated in the leading opinion by Mr. Justice Watts as follows: "The complainant in this case alleges that the water from this dam backed up on her lands, and overflowed them with water, mud, sand, and other deleterious deposits. The complaint states a good cause of action".

And it will be particularly observed that this case is in harmony with the *Commodore Park case;* the factual distinction between the two cases being that in the *Commodore Park case* there had been no invasion of the landowner's "fast lands", while in the *McDaniel case* the complaint was based on the alleged overflow of the plaintiff's land "lying above the dam".

The briefs on both sides in the case before us contain much discussion on the subject of ownership of the land lying between normal high water mark and low water mark on tidal navigable streams, and as to the acquisition of title thereto by private owners. We adhere to our opinion in the case of *Cape Romain Land & Improvement Co. v. Georgia-Carolina Canning Co.,* 148 S. C. 428, 146 S. E. 434, 438, *supra,* wherein it was said: "The title to land below high-water mark on tidal navigable streams, under the well-settled rule, is in the state, not for the purpose of sale, but to be held in trust for public purposes." But we do not deem it necessary or proper upon this appeal to determine under what circumstances and by what method, if any, title might be acquired by private owners, because any such ownership would be, in our opinion, subject to the dominant power of the government (State and Federal) to control and regulate navigable waters.

Plaintiff's Motion to Make Definite

Finally we come to the motion of the plaintiff to require certain allegations of the answer to be made more definite and certain. The first ground of· this motion relates to the parts of certain paragraphs alleging that in addition to the Santee River and Six Mile Creek

there are numerous other navigable waterways which run through or border on the property described in the complaint. And Judge Moss held that the motion in this respect should be granted, and that the defendant should be required to state in its answer in clear and unambiguous language what waterways run through or border on the property of the plaintiff it contends to be navigable streams, either naming such streams or describing them with such certainty that they can be identified by the plaintiff. We are of opinion, however, that to this extent the order of the Circuit Court is in error, because there is no one presumed to have more knowledge of the property described in the complaint than the plaintiff itself, and the matter of navigable streams on or bordering on its property must be peculiarly within its knowledge. *Hughes v. Orangeburg Mfg. Co.*, 81 S. C. 354, 62 S. E. 404; and *Spurlin v. Colprovia Products Co.*, 185 S. C. 449, 194 S. E. 332, and other authorities therein cited.

The second ground of the motion to make more definite and certain, however, relates to an allegation in the answer, in paragraph 35, to the effect that numerous and extensive watercourses and engineering works in aid of navigation, in the vicinity of the property described in the complaint, have been constructed by the United States, or by parties other than defendant, and that these and other works, including the Intracoastal Waterway Canal, substantially changed tidal currents, stream flow, water level, salt content, and other water conditions, all of which caused or contributed to the damage claimed by the plaintiff, none of such damage being caused by the defendant. Judge Moss likewise held as to these allegations that the defendant should make the same more definite and certain by alleging what numerous and extensive watercourses and engineering works in aid of navigation, in addition to the Intracoastal Waterway Canal, have been constructed in the vicinity of the property described in the complaint, that have had the effect alleged, and that have caused or contributed to the damage claimed by the plaintiff, and that each of the same should be

designated in such specific language that it can be recognized and identified by the plaintiff. Our conclusion is that this is a matter which might be deemed within the peculiar knowledge of the defendant, arising out of its construction of the Santee-Cooper Project; and that to this extent the order of the Circuit Judge should be affirmed.

The result is, of course, that the judgment of this Court is that the order of the Circuit Court should be reversed in part and affirmed in part, to wit, that the motion of the defendant to strike out certain allegations of the complaint should have been granted, save and except with reference to certain allegations contained in paragraphs 24 and 25 thereof, relating to hunting, fowling and fishing rights, as to which the motion was properly denied, and these allegations should remain in the complaint; and that the motion of the plaintiff to strike out certain allegations contained in the answer should have been denied as to paragraphs 2 and 6 of the second defense, and as to all of paragraph 4 thereof, save and except the last sentence therein contained, hereinbefore quoted, which should have been stricken out; and that the motion of the plaintiff to make certain parts of the answer more definite and certain should have been denied as to the first ground thereof, but was properly granted as to the second ground thereof, which should remain in full force and effect.

Let the complaint be amended in accordance with this opinion, and duly served upon counsel for the defendant within twenty days after the filing of the remitittur herein; and let the answer be amended in accordance with this opinion, and duly served upon counsel for the plaintiff within twenty days after service of the amended complaint.

Accordingly, the order of the Circuit Court is

Reversed in part and affirmed in part.

FISHBURNE, STUKES, TAYLOR and OXNER, JJ., concur.

BAKER, C. J., not participating.